**THE UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **BRIAN E. BURKE and**<br>**LYNN M. MARGHERIO,**<br>　　　　**Plaintiffs**<br><br>**v.**<br><br>**COLLEEN A. CONLEY, NICOLE MAINE,**<br>**LILA DELMAN REAL ESTATE, LTD., and**<br>**SECOND OPINION HOME INSPECTION OF**<br>**NEW ENGLAND, INC.,**<br>　　　　**Defendants** | )<br>)<br>)<br>)<br>)　　**Case 1:21-cv-**<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT AND JURY DEMAND

**NOW COME** the plaintiffs, Brian E. Burke and Lynn M. Margherio, by and through counsel,

who bring this action against Colleen A. Conley, Nicole Maine, Lila Delman Real Estate, Ltd., and

Second Opinion Home Inspection of New England, Inc. for their failure to disclose the presence of

hazardous levels of waste oil in the crawl space and basement of a second home the plaintiffs purchased

on October 29, 2020.  The plaintiffs state their cause of action as follows:

### PARTIES

1.　　　The plaintiffs, Lynn M. Margherio ("Margherio") and Brian E. Burke ("Burke"), a

married couple, are residents of the City of Cambridge, Middlesex County, Commonwealth of

Massachusetts.

2.　　　The defendant, Colleen A. Conley ("Conley"), is a resident of the City of North

Charleston, Charleston County, State of South Carolina, having a last and usual address of 831 Trent

Street.

1

3.      The defendant, Nicole Maine ("Maine"), is a resident of Washington County, State of Rhode Island, having a last and usual address of 323 Chestnut Hill Road, South Kingstown.

4.      The defendant, Lila Delman Real Estate, Ltd. ("Delman"), is a corporation duly organized under the laws of the State of Rhode Island, with a principal office located at 41 Ocean Road, Narragansett, Rhode Island.

5.      The defendant, Second Opinion Home Inspection of New England, Inc. ("Second Opinion"), is a corporation duly organized under the laws of the State of Rhode Island, with a principal office located at 73 Indian Run Trail, Smithfield, Rhode Island.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction pursuant to 28 U.S.C. §1332(a)(l) because the plaintiffs and the defendants are citizens of different States and the amount in controversy exceeds $75,000 – exclusive of interest and costs.

7.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claim occurred in this judicial district and because the real property that is the subject of the action is situated in this judicial district.

## FACTS COMMON TO ALL COUNTS

### a.  Background Facts

8.      On or about July 1, 1999, Conley acquired ownership of the residence and land located at 145 Sauga Avenue, North Kingston, Rhode Island (the "property").

9.      The property is a .29-acre beach front lot with a 1,691 square foot, two-story wood house built in 1929 on a block foundation.

10.     On or about September 13, 2011, the Town of North Kingstown Mechanical Inspector issued a permit to install a new 275 gallon above-ground heating oil tank outside the house.

11.     On or about December 16, 2017, a service technician with Santoro Oil, a company that serviced the heating system for Conley, wrote the following comments in a note regarding a service call at the property: "Checked boiler couldn't find anything wrong, there is an odor in the basement but not near the boiler."

12.     On or about April 6, 2018, a service technician with Santoro Oil wrote the following comment in a note regarding a service call at the property: "Smell is from old oil leak."

13.     On or about October 3, 2019, a service technician with Santoro Oil wrote the following comment in a note regarding a service call at the property: "Whole house smells like raw oil from an old tank leak under the house in a crawl space - air BnB rental house."

14.     On or about November 7, 2019, a service technician with Santoro Oil wrote the following comments in notes regarding a service call at the property:

> "Met maintenance man at the house.  The odor that permeates through the entire house is the smell of raw oil from an oil tank that leaked in the dirt section of their basement years and years ago.  They need to dig all the dirt out from underneath the house to get rid of the smell."

15.     When they purchased the property on October 29, 2020, the plaintiffs were kept unaware that oil had ever leaked from an oil tank in the crawl space.

### b.  Facts Regarding the Transaction

16.     On or about August 29, 2020, Conley retained the services of Delman to market the property.

17.     On September 8, 2020, Conley, at the direction of Delman, responded to questions about the property on a Rhode Island Real Estate Sales Disclosure Form ("SDF") as required by G.L. 5-20.8-2. (**EXH. A**).

18.     By signing the SDF on September 8, 2020, Conley acknowledged that the information she provided therein was true and accurate to the best of her knowledge. (**EXH. A**).

19.     On or about September 10, 2020, Conley, through her agent, Delman, listed the property for sale at a price of $869,000.

20.     On or about September 12, 2020, the plaintiffs attended an open house showing of the property.

21.     Delman's agent, Nicole Maine, handed Burke the SDF during the open house.

22.     In response to question 5 of the SDF, regarding the heating system at the property, Conley checked off "No," in response to the question, "Do any defects/malfunctions exist?"  (**EXH. A**).

23.     A true and accurate response to question 5 would have been "Yes," with an explanation that a spill from a former aboveground oil tank contaminated the soil of the crawl space causing a noxious odor to pervade the house.

24.     Regarding the heating system, Conley left a blank space and did not answer the part of question 5 that asked, "Modifications?" (**EXH. A**).

25.     A true and accurate response to "Modifications?" would have been "Yes" with an explanation of the circumstances surrounding the installation of the new aboveground oil storage tank in 2011.

26.     In response to question 12 of the SDF, regarding "Insulation," Conley provided "Additional Structural Information" by handwriting, "Cellar/crawl space has been encapsulated (*for* crossed out) with insulation."  (**EXH. A**).

27.     On page five of the SDF, under the caption "Structure," the question was, "Do any defects/malfunctions exist in any of the following?" (**EXH. A**).

28.     In response to question 34 regarding the "Basement," Conley checked "N" for "no," signifying that no defects/malfunctions exist in the basement.  (**EXH. A**).

29.     A true and accurate response to question 34 would have been "Yes," with an explanation that a spill from a former aboveground oil tank spread from the crawl space into the soil beneath the basement floor slab.

30.     Conley gave no response to question 39, "Other Structural Components." (**EXH. A**).

31.     A true and accurate response to question number 39 would have been "Yes," with an explanation that a polyethylene vapor barrier covered a layer of mulch and absorbent sand in the crawl space.

32.     On page six of the SDF, under "Conditions," the question was, "Do any of the following conditions exist?" (**EXH. A**).

33.     In response to question 76, "Hazardous or Toxic Waste," Conley checked "N" for "No." (**EXH. A**).

34.     A true and accurate response to question 76 would have been "Yes."

35.     In response to question 77, "Hazardous or Toxic Waste Site Within 1 Mile," Conley checked "N" for "No." (**EXH. A**).

36.     A true and accurate response to question 77 also would have been "Yes."

37.     In response to question 83 on the SDF, "Sub-Surface Structure(s) or Pit(s)," Conley checked "N" for "No." (**EXH. A**).

38.     A true and accurate response to question 83 would have been "Yes," with an explanation that mulch and sand was used as backfill to cover up and absorb the odor of raw oil emanating from a shallow pit in the crawl space that was covered by a polyethylene vapor barrier.

39.     During the open house on September 12, 2020, the windows had been left open, a breeze came through the house, and the plaintiffs wore masks to protect themselves and others from COVID-19, all of which made the odor of raw oil undetectable to them.

40.     On September 12, 2020, the plaintiffs reviewed the SDF signed by Conley.

41.      In reasonable reliance upon the SDF, the plaintiffs signed a Purchase and Sales Agreement on September 12 (Margherio) and on September 13 (Burke) to purchase the property for $889,000.

42.     Conley signed the Purchase and Sales Agreement on September 14, 2020.

43.     On or about September 22, 2020, Burke signed a Home Inspection Contract with the defendant, Second Opinion.

44.     On or about September 22, 2020, Second Opinion, as part of its overall inspection of the property, conducted a visual inspection of the basement and the crawl space.

45.     In its Inspection Summary, Second Opinion made no observations or comments regarding the shallow pit in the crawl space where an aboveground oil tank was once located.

46.     In its Inspection Summary, Second Opinion made no observations or comments regarding a former copper fuel oil line and residual oil staining the concrete wall on the crawl space.

47.     According to its Inspection Summary, Second Opinion observed the polyethylene vapor barrier covering the crawl space.

48.     In its Inspection Summary, Second Opinion did not describe the polyethylene vapor barrier as evidence of a potential defect or hazard.

49.     On September 30, 2020, the plaintiffs requested that Conley reduce the purchase price in consideration of items identified as needing repairs in Second Opinion's Inspection Summary.

50.     On October 2, 2020, the plaintiffs and Conley executed an amended Purchase and Sales Agreement stating a purchase price of $879,000.

51.     Prior to the closing on October 29, 2020, the plaintiffs had a walk-through inspection of the house to see that Conley left it in broom-clean condition as required by the Purchase and Sales Agreement.

52.     On October 29, 2020, the plaintiffs wore masks to protect themselves and others from COVID-19, which made the odor of raw oil undetectable to them during the brief walk-through inspection.

53.     The plaintiffs purchased the property on October 29, 2020.

54.     On or about November 2, 2020, Burke visited the property for the first time since he and his wife had purchased it three days earlier.

55.     As of November 2, 2020, the windows of the unoccupied house had been closed for days and Burke was not wearing a COVID-19 mask because he was alone.

56.     As he opened the door and stepped inside the house, Burke was overwhelmed by a noxious petroleum odor.

57.     A service technician with Santoro Oil met Burke at the property on November 2, 2020.

58.     The Santoro Oil service technician wrote up a Customer Offer Sheet on November 2 which stated, among other things, "Customer requests a PM NOW," indicating that Mr. Burke expressed urgency about eliminating the noxious petroleum odor by having Santoro Oil perform a Preventative Maintenance on the heating system as soon as possible.

59.     On November 2, Burke scheduled an annual servicing of the heating system on the earliest available date for Santoro Oil, which was December 1, 2020.

60.     Burke left the house on November 2 with the onset of a headache and nausea caused by the noxious petroleum odor.

61.     On or about December 1, 2020, Santoro Oil conducted an annual service of the heating system.

62.     Santoro Oil's technician inspected the burner unit for any combustion leaks, replaced the burner gasket and the flue collector, sealed the burner tube, the door gasket, the flue collector, and the vents with silicone.

63.     On or about December 1, 2020, Santoro Oil's technician found no evidence of defects or malfunctions in the heating oil lines or connections.

64.     Despite these improvements to the heating system, the noxious fuel odor persisted.

65.     On or about December 15, 2020, the plaintiffs retained an environmental consulting firm, Hoffman Engineering, Inc. ("HEI"), to conduct indoor air vapor and soil sampling at the property.

66.     HEI conducted an initial site visit on December 15, 2020.

67.     During the initial site visit, HEI observed that the oil odor was strongest at the crawl space.

68.     During the initial site visit, HEI pulled back the polyethylene vapor barrier covering the crawl space and observed a layer of mulch where the oil storage tank once was.

69.     During the initial site visit, HEI observed that the layer of mulch covered a layer of absorbent sand.

70.     HEI suspected that the mulch and sand were placed under the polyethylene vapor barrier by the previous homeowner to absorb the residual oil and odor.

71.     On or about January 22, 2021, HEI took six samples of the soil at various depths beneath the mulch and sand in the crawl space area.

72.     All six samples showed significantly elevated levels of petroleum hydrocarbons greater than the Rhode Island Department of Environmental Management ("RIDEM") Residential Direct Exposure Criteria ("RDEC").

73.     Supplemental soil samples taken on or about February 4, 2021 showed that contamination exceeding the RIDEM RDEC had spread beneath the basement floor slab at a depth of four to five feet below the floor slab grade.

74.     Air samples taken by HEI from the crawl space and from the first floor of the house on January 21, 2021 showed significantly elevated levels of petroleum hydrocarbon vapors greater than RIDEM reporting limits.

75.     The plaintiffs and their two minor children have not inhabited the house.

76.     The house is uninhabitable in its contaminated condition.

77.     The property is unmarketable in its contaminated condition.

78.     All remedial options for the property involve soil excavation and disposal.

79.     Soil excavation will require temporarily removing the house from its foundation or demolishing the house and replacing it.

80.     The remedial option of demolishing the house and replacing it will present the least undue burden to the plaintiffs; will eliminate the risk of disturbing the structural integrity of the 1929 block foundation and wood frame; will reduce the risk of failing to remove the contaminated soil entirely; and will most efficiently mitigate the damages the plaintiffs have sustained.

## COUNT I – UNJUST ENRICHMENT - CONLEY

81.     The plaintiffs hereby re-allege and incorporate the preceding paragraphs as if set forth completely here.

82.     By accepting $879,000 in exchange for property that she knew was contaminated by hazardous waste oil, Conley unjustly enriched herself at the plaintiffs' expense.

83.     Conley received the plaintiff's payment of $879,000 under circumstances that are unjust and inequitable for her to retain it.

84.     Such acts and omissions leading to Conley's unjust enrichment were the actual and proximate cause of harm to the plaintiffs.

85.     The plaintiffs have suffered damages greater than $75,000 as a direct consequence of Conley's unjust enrichment.

## COUNT II – FRAUD - CONLEY

86.     The plaintiffs hereby re-allege and incorporate the preceding paragraphs as if set forth completely here.

87.     Conley signed the SDF knowing that she had made false and misleading statements of fact and material omissions of fact regarding contamination of the property by hazardous waste oil.

88.     When she submitted the SDF to Delman, Conley was aware that it would be provided to potential buyers of the property such as the plaintiffs.

89.     In violation of RI Gen. Laws § 5-20.8-2, Conley did not state on the SDF all deficient conditions pertaining to the property of which she had actual knowledge.

90.     Conley entered false and misleading information on the SDF and signed it with the intention that potential buyers such as the plaintiffs would rely on the misrepresentations and material omissions contained therein.

91.     On September 12, 2020, the plaintiffs offered to purchase the property in reasonable reliance upon Conley's SDF.

92.     If Conley's SDF had provided true and accurate facts regarding hazardous waste oil on the property, the plaintiffs never would have offered to purchase it.

93.     The plaintiffs have suffered damages greater than $75,000 as a direct consequence of Conley's intentional misrepresentations and omissions of material fact in the SDF.

## COUNT III – NEGLIGENT MISREPRESENTATION – CONLEY

94.     The plaintiffs restate and reallege all preceding paragraphs as if set forth at length herein.

95.     Conley signed the SDF notwithstanding that it contained misrepresentations and material omissions of fact regarding contamination of the property by hazardous waste oil.

96.     Conley's SDF negligently omitted material facts regarding contamination of the property by hazardous waste oil.

97.     When she gave the signed SDF to Delman, Conley was aware that it would be provided to potential buyers of the property.

98.     When she gave the signed SDF to Delman, Conley knew or should have known that the representations she made therein were not true and accurate.

99.     When she gave the signed SDF to Delman, Conley knew or should have known that potential buyers such as the plaintiffs would rely upon it in deciding whether to purchase the property.

100.    The plaintiffs made an offer to purchase the property in reasonable reliance upon the information and omissions of material fact in Conley's SDF.

101.    If Conley's SDF had provided true and accurate facts regarding hazardous waste on the property, the plaintiffs never would have offered to purchase it.

102.    The plaintiffs have suffered damages greater than $75,000 as a direct consequence of Conley's negligent misrepresentations and omissions of material fact.

## COUNT IV– IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING – CONLEY

103.    The plaintiffs hereby re-allege and incorporate the preceding paragraphs as if set forth completely here.

104.    On or about September 12, 2020, the plaintiffs and Conley entered a contract for the sale of the property.

105.    Rhode Island law implies a covenant of good faith and fair dealing in all contracts.

106.    The plaintiffs met their obligations under the contract.

107.    By concealing and failing to disclose material facts regarding the property's contamination by hazardous waste, Conley prevented the plaintiffs from receiving the intended benefits of the contract.

108.    By concealing and failing to disclose material facts regarding the property's contamination by hazardous waste, Conley acted unfairly and in bad faith.

109.    Conley breached the implied covenant of good faith and fair dealing.

110.    The plaintiffs have suffered damages greater than $75,000 as a direct consequence of Conley's breach of the implied covenant of good faith and fair dealing.

WHEREFORE, as to Counts I – IV, the plaintiffs respectfully request that this Court:

   i.    Grant such preliminary injunctive relief as may be necessary to preserve the possibility of recovering damages for the defendant's unjust enrichment.

   ii.    Award them such equitable relief as is necessary to reverse the defendant's unjust enrichment, including, but not limited to, rescission, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies.

   iii.    Award damages to compensate them fairly and reasonably for all harms and losses sustained directly because of the defendant's negligence.

   iv.    Hold Conley jointly and severally liable for the combined negligence of all defendants.

   v.    Award damages sufficient to put them in the same position they would have been in had Conley not breached the implied covenant of good faith and fair dealing.

vi.     Award them punitive damages for Conley's willful concealment of a human health hazard on the property and for her bad faith in doing so; and

vii.    Enter judgment in their favor on all Counts, award them their costs of suit, and such other relief as the Court may determine to be just and proper.

## COUNT V – FRAUD – MAINE

111.    The plaintiffs hereby re-allege and incorporate the preceding paragraphs as if set forth completely here.

112.    As a licensed realtor affiliated with Delman, Nicole Maine is subject to the standards of competency, honesty, and professionalism found in the *Code of Ethics and Standards of Practice of the National Association of Realtors.*

113.    Article 2 of the *Code of Ethics and Standards of Practice of the National Association of Realtors*, as most recently amended in January 2000, states, "Realtors shall avoid exaggeration, misrepresentation, or concealment of pertinent facts relating to the property or the transaction."

114.    Maine was aware that the property is contaminated by hazardous waste oil but concealed this pertinent and material fact from the plaintiffs to induce them to purchase the property.

115.    Maine was aware that a noxious petroleum odor pervaded the house but concealed this pertinent and material fact from the plaintiffs to induce them to purchase the property.

116.    Maine is liable for concealing pertinent and material facts regarding the property about which she was aware.

117.    The plaintiffs never would have offered to purchase the property if Maine had not concealed pertinent and material facts regarding the noxious petroleum odor and soil contamination on the property.

118.    The plaintiffs have suffered damages greater than $75,000 as a direct consequence of Maine's intentional failure to disclose pertinent and material facts regarding the property.

13

## COUNT VI – NEGLIGENT MISREPRESENTATION – MAINE

119.     The plaintiffs hereby re-allege and incorporate the preceding paragraphs as if set forth completely here.

120.     As a licensed realtor affiliated with Delman, Maine is subject to the standards of competency, honesty, and professionalism found in the *Code of Ethics and Standards of Practice of the National Association of Realtors*.

121.     Article 2 of the *Code of Ethics and Standards of Practice of the National Association of Realtors*, as most recently amended in January 2000, states, "Realtors shall avoid exaggeration, misrepresentation, or concealment of pertinent facts relating to the property or the transaction."

122.     Article 2 does not obligate realtors "to discover latent defects in the property."

123.     The noxious petroleum odor pervading the house is not a latent defect.

124.     RI Gen. Laws § 5-20.8-2 provides, "The agent is not liable for the accuracy or thoroughness of representations made by the seller in the written disclosure or for deficient conditions not disclosed to the agent by the seller."

125.     Maine is nevertheless liable for concealing pertinent facts regarding the property about which she knew or should have known independent of Conley's disclosures in the SDF.

126.     Maine was aware or should have been aware of the noxious petroleum odor that pervaded the house and, in the exercise of professional skill and competence, should have required further disclosure on the part of Conley regarding its origin.

127.     Maine was aware or should have been aware of the polyethylene vapor barrier covering the crawl space and, in the exercise of professional skill and competence, should have required further disclosure on the part of Conley regarding its purpose and origin.

128.     Under RI Gen. Laws § 5-20.8-9, Maine is liable to the plaintiffs for Conley's omissions and inaccuracies in the SDF because the subjects of Conley's omissions and inaccuracies were within Maine's personal knowledge; said omissions and inaccuracies were not based on information timely provided pursuant to §§ 5-20.8-7 and 5-20.8-8; and Maine failed to exercise ordinary care in obtaining and transmitting the information in Conley's SDF to the plaintiffs.

129.     Regarding the noxious petroleum odor and the polyethylene vapor barrier covering the crawl space, Maine breached her professional duty to avoid concealing material and pertinent facts relating to the property.

130.     Maine concealed pertinent and material facts relating to the property for the purpose of inducing the plaintiffs to buy the property.

131.     The plaintiffs never would have offered to purchase the property had Maine disclosed that it is contaminated by hazardous waste oil.

132.     The plaintiffs have suffered damages greater than $75,000 as a direct consequence of Maine's negligent failure to disclose that a noxious petroleum odor pervades the house and that the soil in the crawl space and basement is contaminated by hazardous waste oil.

## COUNT VII – UNLAWFUL ACTS AND PRACTICES – MAINE

133.     The plaintiffs hereby re-allege and incorporate the preceding paragraphs as if set forth completely here.

134.     RI Gen. Laws § 6-13.1-2 declares unlawful all unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

135.     The plaintiffs are persons who purchased services primarily for personal, family, or household purposes.

136.    Maine concealed pertinent and material facts relating to the property for the purpose of inducing the plaintiffs to buy the property.

137.    The plaintiffs have suffered an ascertainable loss of money and property, real and personal, as a direct result of Maine's use of an act or practice declared unlawful by § 6-13.1-2.

138.    The plaintiffs have suffered damages greater than $75,000 as a direct consequence of Maine's use of an unfair and deceptive method, act, or practice.

WHEREFORE, as to Counts V - VII, the plaintiffs respectfully request that this Court:

   i.    Award damages to compensate them fairly and reasonably for all harms and losses sustained directly because of Maine's intentional and negligent misrepresentations, and its false advertising of the property.

   ii.   Hold Maine jointly and severally liable for the combined negligence of all defendants.

   iii.  Award the plaintiffs actual damages under Count VII, plus punitive damages and other equitable relief that the Court deems necessary or proper; and

   iv.   Enter judgment in their favor on all Counts, award them reasonable attorneys' fees and their costs of suit under Count VII, and such other relief as the Court may determine to be just and proper.

## COUNT VIII – FRAUD – DELMAN

139.    The plaintiffs hereby re-allege and incorporate the preceding paragraphs as if set forth completely here.

140.    Delman is subject to the standards of competency, honesty, and professionalism found in the *Code of Ethics and Standards of Practice of the National Association of Realtors.*

141.    Article 2 of the *Code of Ethics and Standards of Practice of the National Association of Realtors*, as most recently amended in January 2000, states, "Realtors shall avoid exaggeration, misrepresentation, or concealment of pertinent facts relating to the property or the transaction."

142.     Delman was aware that the property is contaminated by hazardous waste oil but concealed this pertinent and material fact from the plaintiffs to induce them to purchase the property.

143.     Delman was aware that a noxious petroleum odor pervaded the house but concealed this pertinent and material fact from the plaintiffs to induce them to purchase the property.

144.     Delman is liable for concealing pertinent and material facts regarding the property about which it was aware.

145.     The plaintiffs never would have offered to purchase the property if Delman had not concealed pertinent and material facts regarding the noxious petroleum odor and soil contamination on the property.

146.     The plaintiffs have suffered damages greater than $75,000 as a direct consequence of Delman's intentional failure to disclose pertinent and material facts regarding the property.

## COUNT IX – NEGLIGENT MISREPRESENTATION – DELMAN

147.     The plaintiffs hereby re-allege and incorporate the preceding paragraphs as if set forth completely here.

148.     Delman is subject to the standards of competency, honesty, and professionalism found in the *Code of Ethics and Standards of Practice of the National Association of Realtors.*

149.     Article 2 of the *Code of Ethics and Standards of Practice of the National Association of Realtors*, as most recently amended in January 2000, states, "Realtors shall avoid exaggeration, misrepresentation, or concealment of pertinent facts relating to the property or the transaction."

150.     Article 2 does not obligate realtors "to discover latent defects in the property."

151.     The noxious petroleum odor pervading the house is not a latent defect.

152.    RI Gen. Laws § 5-20.8-2 provides, "The agent is not liable for the accuracy or thoroughness of representations made by the seller in the written disclosure or for deficient conditions not disclosed to the agent by the seller."

153.    Delman is nevertheless liable for concealing pertinent facts regarding the property about which it knew or should have known independent of Conley's disclosures in the SDF.

154.    Delman was aware or should have been aware of the noxious petroleum odor that pervaded the house and, in the exercise of professional skill and competence, should have required further disclosure on the part of Conley regarding its origin.

155.    Delman was aware or should have been aware of the polyethylene vapor barrier covering the crawl space and, in the exercise of professional skill and competence, should have required further disclosure on the part of Conley regarding its purpose and origin.

156.    Under RI Gen. Laws § 5-20.8-9, Delman is liable to the plaintiffs for Conley's omissions and inaccuracies in the SDF because the subjects of Conley's omissions and inaccuracies were within Delman's personal knowledge; said omissions and inaccuracies were not based on information timely provided pursuant to §§ 5-20.8-7 and 5-20.8-8; and Delman failed to exercise ordinary care in obtaining and transmitting the information in Conley's SDF to the plaintiffs.

157.    Regarding the noxious petroleum odor and the polyethylene vapor barrier covering the crawl space, Delman breached its professional duty to avoid concealing material and pertinent facts relating to the property.

158.    Delman concealed pertinent and material facts relating to the property for the purpose of inducing the plaintiffs to buy the property.

159.    The plaintiffs never would have offered to purchase the property had Delman disclosed that it is contaminated by hazardous waste oil.

160.    The plaintiffs have suffered damages greater than $75,000 as a direct consequence of Delman's negligent failure to disclose that a noxious petroleum odor pervades the house and that the soil in the crawl space and basement is contaminated by hazardous waste oil.

## COUNT X – FALSE ADVERTISING – DELMAN

161.    The plaintiffs hereby re-allege and incorporate the preceding paragraphs as if set forth completely here.

162.    Delman is subject to the *Code of Ethics and Standards of Practice of the National Association of Realtors.*

163.    Article 2 of the *Code of Ethics and Standards of Practice of the National Association of Realtors*, as amended in January 2000, states, "Realtors shall avoid exaggeration, misrepresentation, or concealment of pertinent facts relating to the property or the transaction."

164.    In marketing the property, Delman made the following exaggerated and false statement:

"Elements of the past have been preserved and blended with upscale features to create the perfect environment for bliss."  See https://liladelman.com/listing/145-sauga-av-north-kingstown-2/.

165.    From an objective standpoint, an element of the past, specifically oil released from a failed storage tank, left hazardous levels of petroleum hydrocarbons in the soil of the crawl space and basement.

166.    Said oil spill caused a noxious petroleum odor to pervade the house.

167.    Because a noxious petroleum odor pervades the house, Delman's statement that the property is a "perfect environment for bliss" is an exaggeration that can be proven objectively false.

168.    Delman's statement is actionable as false advertising because the statement misrepresents a material fact affecting the sale of the property and a reasonable person would rely on the statement in making a purchasing decision.

169.   Delman stated that the property is a "perfect environment for bliss" with the purpose of inducing the plaintiffs to rely upon it in deciding to purchase the property.

170.   The plaintiffs reasonably relied on Delman's statement in deciding to purchase the property.

171.   The plaintiffs have suffered damages greater than $75,000 as a direct consequence of Delman's false advertising.

## COUNT XI – UNLAWFUL ACTS AND PRACTICES – DELMAN

172.   The plaintiffs hereby re-allege and incorporate the preceding paragraphs as if set forth completely here.

173.   RI Gen. Laws § 6-13.1-2 declares unlawful all unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.

174.   The plaintiffs are persons who purchased services primarily for personal, family, or household purposes.

175.   Delman concealed pertinent and material facts relating to the property for the purpose of inducing the plaintiffs to buy the property.

176.   The plaintiffs have suffered an ascertainable loss of money and property, real and personal, as a direct result of Delman's use of an act or practice declared unlawful by § 6-13.1-2.

177.   The plaintiffs have suffered damages greater than $75,000 as a direct consequence of Delman's use of an unfair and deceptive method, act, or practice.

WHEREFORE, as to Counts IX - XI, the plaintiffs respectfully request that this Court:

v.   Award damages to compensate them fairly and reasonably for all harms and losses sustained directly because of Delman's intentional and negligent misrepresentations, and its false advertising of the property.

vi.   Hold Delman jointly and severally liable for the combined negligence of all defendants.

vii.    Award the plaintiffs actual damages under Count XI, plus punitive damages and other equitable relief that the Court deems necessary or proper; and

viii.   Enter judgment in their favor on all Counts, award them reasonable attorneys' fees and their costs of suit under Count XI, and such other relief as the Court may determine to be just and proper.

### COUNT XII – BREACH OF CONTRACT – SECOND OPINION

178.    The plaintiffs hereby re-allege and incorporate the preceding paragraphs as if set forth completely here.

179.    On or about September 22, 2020, Burke and Second Opinion entered a Home Inspection Contract.

180.    Under Part I of said Contract, Second Opinion agreed, in exchange for valuable consideration, to "perform a home inspection of the building according to the American Society of Home Inspectors' *Standards of Practice*."

181.    Under Section 11.1 of the American Society of Home Inspectors' *Standards of Practice*, the inspector shall inspect "vapor retarders in unfinished spaces" and shall describe the same in an inspection report to the customer.

182.    The polyethylene vapor barrier in the crawl space was readily accessible to Second Opinion.

183.    In breach of the express terms of the Contract, Second Opinion failed to inspect the polyethylene vapor barrier covering the crawl space and failed to describe it in its Inspection Summary other than to state, "Crawlspace has a mostly tight vapor barrier."

184.    Instead of addressing the "mostly tight" vapor barrier as a condition requiring further investigation, as it did with other potentially defective systems and structures, Second Opinion designated the dirt floor of the crawl space as "Serviceable" in its Inspection Summary.

185.    Second Opinion breached its Contract with the plaintiff, Burke.

186.    Second Opinion's breach of the Contract has damaged the plaintiffs in an amount greater than $75,000.

## COUNT XIII – NEGLIGENCE – SECOND OPINION

187.    The plaintiffs hereby re-allege and incorporate the preceding paragraphs as if set forth completely here.

188.    Under Parts II and III of its Home Inspection Contract with Burke, Second Opinion attempted to limit its liability for negligent or wrongful errors or omissions by use of a clause that limits the damages for negligent or wrongful errors or omissions.

189.    Second Opinion is a licensed home inspector under Rhode Island law.

190.    Under RI Gen. Laws § 5-65.1-11(12), the State of Rhode Island Contractors' Registration and Licensing Board may impose discipline on any licensed home inspector who is found to have attempted to limit its liability for negligent or wrongful errors or omissions by use of a damages-limiting clause in a home inspection contract.

191.    The damages-limiting clauses within Parts II and III of the Contract are void and unenforceable as against the public policy expressed in § 5-65.1-11(12).

192.    Second Opinion owed a duty of care to the plaintiff, requiring Second Opinion to exercise the knowledge, skill and ability ordinarily exercised by other similarly situated home inspectors.

193.    Second Opinion was negligent in failing to observe the shallow pit in the crawl space.

194.    Second Opinion was negligent in failing to identify the shallow pit in the crawl space as a potential defect or hazard in its Inspection Summary.

195.    Second Opinion was negligent in failing to observe the former copper fuel oil line and residual oil staining along the concrete wall on the crawl space.

196.    Second Opinion was negligent in failing to identify the former copper fuel oil line and residual oil staining along the concrete wall as evidence of a potential defect or hazard.

197.    Second Opinion was negligent in failing to identify the polyethylene vapor barrier covering the crawl space as evidence of a potential defect or hazard in the Inspection Summary.

198.    Instead of addressing the "mostly tight" vapor barrier as a condition requiring further investigation, as it did with other potentially defective systems and structures, Second Opinion negligently designated the dirt floor of the crawl space as "Serviceable" in its Inspection Summary.

199.    The negligent acts and omissions of Second Opinion described herein were below the standard of care ordinarily exercised by other similarly situated home inspectors.

200.    The plaintiffs would not have offered to purchase the property if Second Opinion, in the exercise of reasonable care, had identified potential defects and hazards in the crawl space as part of its Inspection Summary.

201.    As a direct and proximate result of Second Opinion's negligence, the plaintiffs have suffered damages in an amount greater than $75,000.

WHEREFORE, as to Counts XII - XIII, the plaintiffs respectfully request that this Court:

    i.    Award damages to compensate them fairly and reasonably for all harms and losses sustained directly because of the defendant's breach of contract and negligence.

    ii.    Hold Second Opinion jointly and severally liable for the combined negligence of all defendants; and

    iii.    Enter judgment in their favor on all Counts, award them their costs of suit, and such other relief as the Court may determine to be just and proper.

**THE PLAINTIFFS REQUEST A JURY TRIAL ON ALL COUNTS SO TRIABLE.**

Respectfully submitted,
The Plaintiffs, LYNN M. MARGHERIO, et al.,

By their Attorneys,

*/s/ Andrew H. Berg*
_____
Andrew H. Berg, Bar No. 4754
Sammartino & Berg, LLP
1350 Division Road, Suite 102
West Warwick, Rhode Island 02893
Telephone:     (401) 274-0113
Facsimile:     (401) 274-0175
Email:             BERG@SBLLP.NET

*/s/ Nicholas S. Guerrera*
_____
Nicholas S. Guerrera, *Pro Hac Vice Adm. Pending*
Shaheen, Guerrera & O'Leary, LLC
Jefferson Office Park
820A Turnpike Street
North Andover, MA 01845
Telephone:     (978) 689-0800
Facsimile:     (978) 794-0890
Email:             nguerrera@sgolaw.com

Dated:  April 22, 2021